# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### 1:06CV191

|  |  |  |
|---|---|---|
| **FAIRFIELD RESORTS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **FAIRFIELD MOUNTAINS** | ) | |
| **PROPERTY OWNERS** | ) | |
| **ASSOCIATION, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** came on for hearing before the Court on June 30, 2006, on Plaintiff's motion for a preliminary injunction. Having considered the submissions of the parties, arguments of counsel, and the applicable legal standards, the Court grants Plaintiff's motion for preliminary injunction.

## I. FACTS

Plaintiff Fairfield Resorts, Inc., is a Delaware corporation with its principal place of business in Florida. **Complaint, filed June 20, 2006, ¶**

Dockets.Justia.com

2

**3.**  As part of its various business endeavors, Plaintiff manages 85 timeshare units at the "Fairfield Mountains" resort located in Lake Lure, North Carolina ("the resort").  *Id.*  Plaintiff's management of these units includes providing telephone and laundry services.  **Plaintiff's Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction ("Plaintiff's Memorandum"), filed June 21, 2006, at 3.**  The laundry service is used to launder all linens from the resort's units upon the departure of the guests.  The telephone service consists of a switchboard unit through which all outgoing and incoming calls to the timeshare units are routed.  According to Plaintiff, the 85 units located at the resort can accommodate approximately 4,335 guests each year.  **Affidavit of Donna McElrath, filed June 20, 2006, ¶ 3.**  At the June 30, 2006, hearing on this matter, Plaintiff's counsel estimated that between 200 and 400 individuals per week utilize the timeshare units.

Defendant Fairfield Mountains Property Owners Association, Inc. ("Defendant" or "the POA"), is a non-profit corporation organized under the laws of North Carolina and with its principal place of business located in North Carolina.  **Complaint, ¶ 4.**  Defendant "owns and operates amenities, including two golf courses, a recreation center, a marina,

3

swimming pools, and three restaurants," used by occupants of the 85 timeshare units managed by Plaintiff. *Id.* Defendant owns the property in which Plaintiff's laundry and telephone facilities are located. *Id.*; *see also*, **Plaintiff's Memorandum; Defendant's Memorandum in Opposition to Motion for Preliminary Injunction, filed June 29, 2006.**

The relationship between these parties, at least as is relevant to this matter, began in the early 1990's. Plaintiff was the owner of certain real property, including "Bald Mountain Golf Course and Country Club." **Complaint, ¶ 7;** *see also*, **Exhibit A, Fairfield Mountains Settlement Agreement ("Settlement Agreement"),** *attached to* **Complaint.** When Plaintiff filed for bankruptcy under chapter 11, Defendant POA filed certain adversary claims in that proceeding. **Complaint, ¶ 8; Settlement Agreement, at 1.** As part of the Settlement Agreement executed to dispose of Defendant's claims, certain resort lands and amenities were transferred to Defendant. **Settlement Agreement, ¶¶ 2, 5.**

The settlement agreement also granted Plaintiff the option of leasing certain spaces within the Bald Mountain Country Club at a rate of $1.00 per year "for as long as Fairfield operates a sales or management operation at the Mountains," plus payment of a pro-rata share of the

4

operating costs of the building in which the leased space is located. *Id.*, ¶
**10.** If such leasing was to occur, separate leases were to be executed for
each area to be leased. *Id.* It is in this leased space that Plaintiff operates
the telephone operations center. **McElrath Affidavit, ¶ 4.**

Another portion of the settlement agreement gave Plaintiff the option
to extend by 10 years an existing lease on a laundry facility located in the
Bald Mountain maintenance area, such that the total lease term would be
25 years. **Settlement Agreement, ¶ 14; McElrath Affidavit, ¶ 3.** Plaintiff
subleases this space to a laundry service subcontractor, a sublease to
which Defendant gave its approval. **McElrath Affidavit, ¶ 3; *see also*,**
**Exhibit B, February 16, 1993, Letter from Defendant POA to Fairfield**
**Communities, Inc., *included* as part of the Maintenance Lease,**
***attached to* Complaint (acknowledging Defendant's consent to**
**Plaintiff's subleasing a portion of the space covered by the**
**Maintenance Lease to a laundry service subcontractor).**

Plaintiff exercised both of its lease options and two separate leases
were thereafter executed on February 9, 1993. ***See*, Maintenance Lease;**
**Exhibit C, Country Club Lease, *attached to* Complaint.** Both leases
provide for a specific amount of "rental" each month, with such payment to

be revised on a yearly basis "if the operating expenses for the immediately preceding year varies from the rental paid for such year by ten percent (10%) or more." **Maintenance Lease, ¶ 4;** *see also***, Country Club Lease, ¶ 4.** Both leases also contain an exhibit showing how the exact amount of "rental" was determined. ***See,* Maintenance Lease; Country Club Lease.** The parties have been operating under these leases for the previous 13 years.

On April 2, 2006, Plaintiff received a letter from the head of the POA stating, in pertinent part, that "Fairfield does not pay any rent. Fairfield only pays a share of what would customarily be referred to as common charges, which charges in these cases include utilities. The Board takes the position that the lease is a nullity because there is no actual rent being paid." **Exhibit D, March 30, 2006, POA Letter,** *attached to* **Complaint.** Defendant's March 30 letter further asserts that unless Plaintiff pays a certain sum each month, which calculates to approximately four times the combined amount of rent Plaintiff is currently paying for the leased spaces, Plaintiff will have to vacate the premises. ***See, id.***; **Maintenance Lease; Country Club Lease.** Plaintiff responded on April 20, 2006, asserting the validity of the leases and requesting documentation that would support an

increase in Plaintiff's payments consistent with the terms of the leases.

*See*, **Exhibit E, April 20, 2006, Fairfield Resorts Letter,** *attached to*

**Complaint.**

Defendant's next correspondence was dated May 26, 2006, and

asserted that the Maintenance Lease was now terminated.

> Please be advised that pursuant to our letter dated March 30, 2006, the above-referenced lease is now terminated.  You will have thirty (30) days from May 29, 2006 to remove your property from this facility.  Any property left will be stored at your expense.  We are not responsible for any of your property or property of any sublessee left in this facility.

**Exhibit F, May 26, 2006, POA Letter,** *attached to* **Complaint.**

Plaintiff filed this action on June 20, 2006, seeking a declaratory

judgment that the leases are valid and injunctive relief preventing

Defendant from evicting Plaintiff in contravention of the leases' terms.

Plaintiff also seeks a preliminary injunction prohibiting eviction pending

resolution of this dispute on the merits, which motion is the subject of this

Memorandum and Order.  **Complaint; Plaintiff's Motion for Preliminary**

**Injunction, or, in the Alternative, Temporary Restraining Order, filed**

**June 21, 2006.**

## II. LEGAL STANDARD

The decision to grant or deny interim injunctive relief is within the sound discretion of the district court.  ***See***, ***Hughes Network Sys. v. InterDigital Commc'ns Corp.***, **17 F.3d 691, 693 (4th Cir. 1994).**  "Granting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way.  The danger of a mistake in this setting is substantial."  ***Scotts Co. v. United Indus. Corp.***, **315 F.3d 264, 284 (4th Cir. 2002) (citations and internal quotations omitted).**  As such, a preliminary injunction is considered "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it."  ***Direx Israel, Ltd. v. Breakthrough Med. Corp.***, **952 F.2d 802, 811 (4th Cir. 1992) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir. 1989)).**  "Whenever the extraordinary writ of injunction is granted, it should be tailored to restrain no more than what is reasonably required to accomplish its ends.  Particularly is this so when preliminary relief, on something less than a full record and full resolution of the facts, is granted."  ***Consolidation Coal Co. v. Disabled Miners of S. W. Va.***, **442 F.2d 1261, 1267 (4th Cir. 1971); *see***

8

*also***, *Anheuser-Busch, Inc. v. Stroh Brewery Co.***, 750 F.2d 631, 653 (8th Cir. 1984) ("Injunctions must be tailored narrowly to remedy the specific harm shown rather than to enjoin all possible breaches of the law.").**

The Court applies a four-part balancing test to determine whether interim injunctive relief should issue. ***Direx Israel, supra.*** Under this balancing test, the Court must consider "'(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest.'"[1] ***Willis v. Town of Marshall***, 426 F.3d 251, 267 (4th Cir. 2005) (quoting *Direx Israel,* at 812)*; see also*, *Wetzel v. Edwards*, 635 F.2d 283, 287 (4th Cir. 1980).** Although no one factor is generally dispositive,[2] the two most important are "probable irreparable injury to the plaintiff if an

_____

[1] The Court is also guided by Fed. R. Civ. P. 65 which governs the procedural requirements attendant to the granting of injunctive relief.

[2] A failure to show any risk of irreparable harm is sufficient grounds for denial of a motion for interim injunctive relief, as likelihood of success on the merits alone - without any showing of a risk of irreparable harm - is not sufficient to warrant the issuance of a preliminary injunction. ***See, Blackwelder Furniture Co. v. Seilig Mfg. Co.***, 550 F.2d 189, 196 (4th Cir. 1977).**

9

injunction is not issued and likely harm to the defendant if an injunction is

issued." *Id.*

> When deciding whether to grant a preliminary injunction, the
> court must first determine whether the plaintiff has made a
> strong showing of irreparable harm if the injunction is denied; if
> such a showing is made, the court must then balance the
> likelihood of harm to the plaintiff against the likelihood of harm
> to the defendant.  If the balance of the hardships tips decidedly
> in favor of the plaintiff, then typically it will be enough that the
> plaintiff has raised questions going to the merits so serious,
> substantial, difficult, and doubtful, as to make them fair ground
> for litigation and thus for more deliberate investigation.  But if
> the balance of hardships is substantially equal as between the
> plaintiff and defendant, then the probability of success begins
> to assume real significance, and interim relief is more likely to
> require a clear showing of a likelihood of success.

*Scotts* Co., 315 F.3d at 271 (internal quotations and citations omitted).

When considering the harm to the parties flowing from the issuance or

non-issuance of the requested preliminary injunction, the real issue for the

Court's consideration is the level of harm resulting from the *improper* grant

or denial of the petitioner's request.  *Id.,* at 284.

> "If the judge grants the preliminary injunction to a plaintiff who it
> later turns out is not entitled to any judicial relief – whose legal
> rights have not been violated – the judge commits a mistake
> whose gravity is measured by the irreparable harm, if any, that
> the injunction causes to the defendant while it is in effect.  If the
> judge denies the preliminary injunction to a plaintiff who it later
> turns out is entitled to judicial relief, the judge commits a
> mistake whose gravity is measured by the irreparable harm, if

10

any, that the denial of the preliminary injunction does to the plaintiff."

***Id.*, at 284-85 (quoting *American Hosp. Supply Corp. v. Hospital Prods. Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986)).**  The Court focuses on the harm attendant to an *improper* grant or denial because there is no "harm," at least as that term is used in the realm of equity and equitable relief, where a party is restrained from doing that which it may properly be restrained from doing, or where the court refuses to restrain a party from doing that which it may properly do.

## III. ANALYSIS

### A. Harm to Plaintiff and Defendant

The Court's first consideration is the harm flowing to each party from an improper grant or denial of the motion for preliminary injunction.  The parties agree that Defendant will incur no irreparable harm from the improper grant of Plaintiff's motion.  ***See*, Plaintiff's Memorandum, at 16-17; Defendant's Opposition, at 7 ("The Association will not be Harmed by the Entry of an Injunction[.]").**

11

The parties disagree, however, on the harm to Plaintiff from the improper denial of Plaintiff's motion for injunctive relief.  Plaintiff asserts that if the injunction is improperly denied, and Plaintiff is subsequently evicted from the leased property before resolution on the merits, it will suffer irreparable harm in the form of loss of good will, harm to its reputation, and lost customers.  **See, Plaintiff's Motion, ¶ 20; Plaintiff's Memorandum, at 12-15; McElrath Affidavit, ¶ 8.**[3]  Plaintiff asserts the existence of additional irreparable harm in that real property is considered unique and, "upon information and belief," Defendant intends to demolish the leased spaces after evicting Plaintiff.  **See, Plaintiff's Motion, ¶ 20; Plaintiff's Memorandum, at 15-16; McElrath Affidavit, ¶ 9.**  The loss of good will, loss of customers, harm to reputation, and significant interference with the possession of real property asserted by Plaintiff are all recognized "irreparable harms."  **See, Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates the**

---

[3] The McElrath Affidavit has two paragraphs numbered "8."  The Court will renumber the second paragraph bearing the number "8," which appears on page 3 of the Affidavit, as paragraph "9" for purposes of this Memorandum and Order.

12

**possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.");** *K-Mart Corp. v. Oriental Plaza, Inc.*, **875 F.2d 907, 915 (1st Cir. 1989) ("Real estate has long been thought unique, and thus, injuries to real estate interests frequently come within the ken of the chancellor.");** *Pelfresne v. Village of Williams Bay*, **865 F.2d 877, 883 (7th Cir. 1989) ("As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute.").**

Defendant argues there is no risk of irreparable harm to the Plaintiff because there have been only "mere threats of actions in letters, which cannot be enforced." **Defendant's Opposition, at 7.** Defendant asserts that the only way to properly remove Plaintiff from the premises will be for Defendant to file a summary ejectment proceeding, which Defendant has not yet done. *Id.* In other words, Defendant takes the position that Plaintiff's "motion for preliminary injunction is premature." *Id.*

The Court does not find Defendant's argument sufficient to overcome Plaintiff's irreparable harm showing. It is true that there is a proper way for Defendant to undertake removing Plaintiff from the leased properties.

13

However, there is almost always a proper way to go about any particular undertaking. If it were enough to merely show that a particular legal means to perform some action existed, few, if any, preliminary injunctions would ever issue. Although the Defendant here has not yet physically removed (or attempted to physically remove) Plaintiff from the properties subject to the leases, Defendant's intention to do so is clear from both the tone and express language of its communications to Plaintiff. *See,* **Exhibits D and F,** *supra.* Defendant's communications to Plaintiff did not state that Defendant considered the leases terminated and that if Plaintiff did not vacate the premises a summary ejectment action would be instituted. *See,* **Exhibit D (showing Defendant's counsel as being "copied"); Exhibit F (same).** Rather, the letters communicated to Plaintiff that it and its property would be removed within 30 days of May 29, whether such removal was undertaken "voluntarily" by Plaintiff or through force by Defendant. *See, id.* Plaintiff was not required to take a "wait and see" approach until June 29 to determine whether Defendant would follow through on its threat of removing Plaintiff and its property from the property subject to the leases. When Defendant's position remained unchanged after another attempt at resolution by Plaintiff, and with only one week

14

remaining before the Defendant's "deadline" expired, Plaintiff finally sought protection pending a determination of the parties' respective rights. **See, Exhibit G, June 2, 2006, Fairfield Properties Letter,** *attached to* **Complaint.** Given Defendant's language and tone in its communications, and that the date for the threatened actions had nearly approached, the Court finds that there exists enough of a present threat of immediate irreparable harm for Plaintiff's motion to be properly before the Court. ***See, e.g., Direx Israel, supra,* at 816 ("A plaintiff, seeking preliminary relief, must show the present *threat of irreparable harm*." (emphasis added)).**

The Court finds that Plaintiff has made a strong showing of a present threat of irreparable harm, including the loss of customers, loss of good will, damage to its business reputation, and significant interference with the possession and enjoyment of certain real property. The Court finds that such irreparable harm strongly outweighs the potential irreparable harm to Defendant, of which the parties have agreed there is none. The Court, therefore, finds that the balance of harm to Plaintiff and Defendant from the improper grant or denial of Plaintiff's motion tips decidedly in Plaintiff's favor.

15

## B. Likelihood of Success on the Merits

The second consideration for the Court is Plaintiff's likelihood of success on the merits.  Having found that the balance of hardships tips decidedly in Plaintiff's favor, it will "be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation."  **Scotts Co., 315 F.3d at 271 (citation and quotation marks omitted); *see also*, *Gilliam v. Foster*, 61 F.3d 1070, 1078 n.5 (4th Cir. 1995).**

Because Plaintiff is only required to raise "questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation," and because Defendant agrees that a "substantial question" exists, the Court finds that Plaintiff has satisfied its burden under this portion of the four-part test.  **Scotts Co., *supra*; Defendant's Opposition, at 2.**

## C. Public Interest

The final consideration for the Court is the public interest.  The Court finds that such interest weighs in favor of granting Plaintiff's motion.

16

According to Plaintiff's estimate, approximately 200 to 400 members of the public would be significantly affected if Defendant is not enjoined from evicting Plaintiff prior to a determination on the merits.  Aside from the general inconvenience these persons would incur from a lack of laundry and telephone services, issues of sanitation arise in regards to the inability to launder the linens from a unit between guest stays, and safety issues arise from the inability to make even emergency phone calls from the telephones in the timeshare units.  Taking all of these matters into consideration, the Court finds that the public interest weighs in favor of preserving the status quo pending a determination of the parties' respective rights.

## D. Balancing Test

Having taken account of each of the four parts of the "hardship balancing" test used in this Circuit for deciding questions regarding preliminary injunctive relief, the Court finds issuance of a preliminary injunction to be an appropriate measure.  Therefore, Defendant will be enjoined, pending resolution of this matter on the merits or further Order of this Court, from removing Plaintiff (or Plaintiff's property) from the property

17

subject to the Maintenance and/or Country Club Leases.  Defendant is likewise enjoined from removing any sublessee (or any property belonging thereto) who's sublease was approved by Defendant and who is utilizing property subject to the Maintenance or Country Club Leases as allowed by such sublease.

In accordance with Rule 65(c), and pursuant to Defendant's oral request at the hearing on this matter, the Court will set a performance bond in the amount of $50,000.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that Plaintiff's motion for preliminary injunction is **GRANTED**; the terms of such injunction shall be set forth in a separate order filed contemporaneously herewith.

Signed: July 7, 2006

Lacy H. Thornburg
United States District Judge