# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### 1:06cv191

| | | |
|---|---|---|
| **FAIRFIELD RESORTS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| **FAIRFIELD MOUNTAINS PROPERTY** | ) | |
| **OWNERS ASSOCIATION, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the court on plaintiff's Motion for Summary Judgment (#68) and defendant's Motion for Partial Summary Judgment (#73). Having carefully considered the pending dispositive motions and conducted a hearing, the court enters the following findings, conclusions, and Recommendation.

## FINDINGS AND CONCLUSIONS

### I.    Background

This action now concerns five signs and two leases for an office and maintenance facility, all located at what is now called "Rumbling Bald Resort," which was previously called "Lake Lure Golf & Beach Resort," and was originally known as "Fairfield Mountains Resort." A preliminary injunction is now in place which prohibits the defendant from removing plaintiff or its signs from the property until this action is resolved.

Plaintiff has moved for summary judgment on the three claims contained in the

Amended Complaint.   (Docket Entry #39) In addition, plaintiff seeks summary judgment on defendant's first counterclaim.   In its first claim for relief, plaintiff seeks a declaratory judgment regarding the validity of the leases. Id., at ¶¶ 33-38.  In the second claim for relief, plaintiff seeks a declaratory judgment holding its signage rights under the settlement agreement to be valid and enforceable. Id., at ¶¶ 39-43. In the third claim, plaintiff seeks  to make the preliminary injunctions permanent as to its rights under the leases and the settlement agreement.  In its first counterclaim, defendant asserts that plaintiff has breached the leases by not paying proper rent.

Defendant has filed a cross Motion for Partial Summary Judgment and in the Alternative to Modify the Preliminary Injunction.   Defendant seeks summary judgment in its favor on plaintiff's second cause of action and on plaintiff's third cause of action as to a permanent signage injunction.  Defendant also seeks summary judgment as to its own fifth counterclaim, which seeks to have the signage easement declared unenforceable because it is in an unrecorded document, the document is unsigned and not referenced in any conveyance, and the description is vague and too broad.  See Answer to Amended Complaint and Counterclaim, at ¶¶ 71-74.[1] As to the alternative motion to modify the district court's Preliminary Injunction, to which there appears to be some agreement, such request is beyond the reference given to the undersigned by the district court.  The undersigned reports that the parties are in agreement that the Preliminary Injunction should be modified so as to apply to only

---

[1]      The court notes that defendant has two paragraphs numbered "73" its Amended Answer and no paragraph "74."

five signs, and the undersigned has instructed counsel to jointly submit any consent modification to the district court for consideration.

For the reasons that follow, the undersigned will respectfully recommend that plaintiffs' Motion for Summary Judgment be granted in its entirety and that defendant's Motion for Partial Summary Judgment be denied

## II.    Discussion

### A.    Summary Judgment Standard Generally

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial.  Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*."  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts.  Anderson, supra.  "Only disputes over facts that might affect the

outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a defendants' Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

### B.    Standard Applicable to Cross Motions for Summary Judgment

In this case, cross-motions for summary judgment have been filed. Where cross motions for summary judgment are filed, such motions are

> no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary

judgment.

In short, the mere fact that both parties seek summary judgment does not constitute a waiver of a full trial or the right to have the case presented to a jury.

Wright & Miller, 10A *Fed. Prac. & Proc. Civ.*3d § 2720.

## C.    Undisputed Facts Applicable to All Motions

### 1.    The Underlying Agreements

The parties have not submitted a statement of undisputed facts. The court has, from the differing recitations of the facts, attempted to piece together the facts that are not disputed.

It appears to be undisputed that Fairfield, or its predecessor in interest, is the original developer of a resort formerly known as "Fairfield Mountains," which is located in Lake Lure, North Carolina. Since the defendant, hereinafter referred to as "the POA" took over the amenities in 1993, the POA has re-branded the resort twice, first as "Lake Lure Golf & Beach Resort," and more recently as "Rumbling Bald Resort." Plaintiff's Ex. U.

Begun in 1977, the resort appears to consist mainly of condominiums, many of which are owned as "timeshares," as well as resort amenities that include tennis courts, swimming pools, a recreation center, a marina, two golf courses, and restaurants.

Well into the development of Fairfield Mountains Resort, Fairfield filed for Chapter 11 bankruptcy in or about 1992 in the United States Bankruptcy Court for the Eastern District of Arkansas. At that time, the POA has a number of civil claims against Fairfield and in settlement of those claims the amenities of the resort were

transferred to the POA in 1993, as evidenced by the "Settlement Agreement" entered into by the parties in 1992. As part of the "Settlement Agreement," and in exchange for relinquishing claims against the estate, the POA and Fairfield agreed and the bankruptcy court approved (1) the transfer of the amenities to the POA; (2) and agreement to lease back to Fairfield office and maintenance space within the resort for 25 years; and (3) a Signage Agreement, whereby Fairfield was allowed to maintain certain signs on common areas during the period of its tenancy. The legal meaning of the later two is at issue in this action.

In determining what facts are disputed and undisputed, the undersigned has considered the official records of the United States Bankruptcy Court for the Eastern District of Arkansas. As with any other official records of court proceedings, the undersigned has given such documents full faith and credit. Plaintiff has provided this court with *true teste* copies of those records. From a review of those records, it appears that Fairfield and the POA entered into a "Signage Agreement." Incorporated into the bankruptcy court's Order Approving Settlement of Claim, the final Signage Agreement of these parties appears as an attachment to the "Supplement to Motion to Approve Settlement of Claims," which was filed in the bankruptcy court by Fairfield on January 27, 1993, as an attachment. Such filing indicates that it was served on counsel for the POA, and indicates that the exhibits attached to the Settlement Agreement should be replaced by "the exhibits attached to this Supplement." Plaintiff's Ex. L., at ¶¶ 4-5. The motion further provided that "[a]ny objection to the Motion, as supplemented hereby, must be filed by February 9, 1993,

or the Court shall enter an Order approving same." Id., at ¶ 8. On February 10, 1993, the bankruptcy court entered its Order Approving Settlement of Claims, which specifically referenced the Supplement to Motion to Approve Settlement of Claims. Plaintiff's Ex. M. Inasmuch as such Order has become final, no challenge can be made before this court as to compliance with the bankruptcy rules in 1993 or the validity of the court's judgment. This court notes in any event that the procedures utilized appear to comply in all respects with bankruptcy rules and practices.

In relevant part, the Signage Agreement attached to the Supplement to Motion to Approve Settlement of Claims provides that

> The properties listed on Exhibits "A" and "B" are to be conveyed by Fairfield Communities, Inc. to the POA subject to the following terms and conditions:
> 
> * * *
>
> (e)    An easement allowing Fairfield to retain and reserve the exclusive right to maintain and/or modify all its existing signs and the non-exclusive right to maintain and/or modify existing signs not owned by Fairfield and to add new signs at Fairfield Mountains on properties conveyed to the [POA] . . . by Fairfield for as long as Fairfield operates a sales office or management operation at what is presently known as Fairfield Mountains.

Plaintiff's Ex. L., at 6.

## 2.    The 2006 Dispute Concerning Signage

On January 23, 2006, the POA changed the name of the resort from "Lake Lure Golf & Beach Resort" to "Rumbling Bald Resort." Plaintiff's Ex. U. Some seven months later, on July 27, 2006, the POA informed Fairfield of the name change and of its intent to replace Fairfield's signs located on any common areas to reflect the new name. Id. The POA advised, as follows:

> In the coming weeks we will begin replacing the signs within the control of the [POA] . . . which includes those signs located on our common areas and lots. If you wish to have any of the signs we will be replacing, please contact me by August 20, 2006 . . . .

Id.

On August 1, 2006, Fairfield responded to the POA's letter, reminding the POA that the signs are governed by the Settlement Agreement:

> pursuant to the parties' Settlement Agreement . . . the POA does not have the right to unilaterally remove Fairfield's signs. . . . Accordingly, any attempts by the POA to remove Fairfield's signs are directly contrary to and in breach of the terms of the Settlement Agreement.

Plaintiff's Ex. V. Fairfield further made demand in that letter that the POA provide it with written confirmation of its intent to abide by the Settlement Agreement. The POA never provided such assurance, and on August 29, 2006, the district court granted a Preliminary Injunction, which prohibited the POA from removing, replacing, or modifying any existing signage at Fairfield Mountains.

### 3.  2006 Dispute as to the Leases

After the POA decided to change the resort's name, but before the POA informed Fairfield of the name change or its intent to take down Fairfield's sign, the POA informed Fairfield that it had failed to pay any rent for the past 13 years despite Fairfield making in excess of 300 rental payments to the POA for the office and maintenance facilities. For the first time in 13 years, the POA informed Fairfield by letter that it had failed to pay rent and that the payments it had made were simply "common charges." The POA made such allegation despite payment by Fairfield of the exact amount specified in the leases under the respective "Rental" provisions.

There is no genuine issue of material fact that the Landlord/Tenant relationship between these parties is governed by two leases that have been in effect since 1993. It is also undisputed that both leases were for a term of 25 years and that both leases contained "Rental" clauses - - which were captioned "Rental" - - which were substantially similar:

> 4.     <u>Rental</u>.  Tenant shall pay Landlord as rental for the term hereinabove specified, adjusted as hereinafter provided, the sum of $641.08 each month, payable in advance on the first day of each moth throughout the term of this lease.  A schedule of the monthly rental calculation is attached hereto as Exhibit "C."
>
> The annual rental and the monthly installments provided hereinabove shall be revised annually on each anniversary date (each "Lease Year") of this lease if the operating expenses for the immediately preceding year varies from the rental paid for such year by ten percent (10%) or more.  The monthly rental for the new lease year shall be equal to one-twelfth of the anticipated operating expenses for such year.

Plaintiff's Ex. B, at ¶ 4.  A similar provision is found in the office lease, Plaintiff's Ex. C., at ¶ 4, with the office rent being $861.88 monthly.  It is undisputed that for the first 13 years of the 25 year lease, Fairfield made all monthly rental payments and the POA accepted such rental payments.  It is undisputed that Fairfield subleases the maintenance facility to a contractor who provides Fairfield's guests with laundry services and that the office space is used to house a phone bank that routes guests' calls for the 85 units managed by Fairfield.  It is equally undisputed that the POA never sought to increase the rent through an annual revision.

The dispute as to the leases arose in March 2006, when the Chief Executive Officer of the POA , Brett Martin, wrote to Fairfield to advise it that for the past 13 years it had not been paying rent to the POA, but had instead been paying "common

charges." Mr. Martin advised Fairfield in relevant part, as follows:

> In each case, Fairfield does not pay any rent. Fairfield only pays a share of what would customarily be referred to as common charges, which charges in these cases include utilities.
> The Board takes the position that the lease is a nullity because there is no actual rent being paid. Therefore, Fairfield must start paying rent effective April 1st on each leased premises as follows
> 1. Bald Mountain Country Club $2,060.00 . . . per month.
> 2. Bald Mountain Maintenance Facility $3,283.00 . . . per month.
> Should Fairfield decide not to pay the above-listed rents then Fairfield will have thirty (30) days from April 1st to vacate any and all premises in question.

Plaintiff's Ex. G.

On April 20, 2006, Fairfield responded to Mr. Martin's letter informing him of the "rental" provisions contained in the lease agreements. Further, Fairfield stated that it had made all payments in accordance with the lease, and that payment of the proposed increased rent was not consistent with the leases and was not a basis for termination of the leases. Plaintiff's Ex. H. On May 26, 2006, the POA sent a letter purportedly terminating the leases for non-compliance with the requirements of the POA's earlier letter, providing Fairfield with 30 days to vacate the premises. Plaintiff's Ex. I. On June 2, 2006, Fairfield responded reaffirming that it had acted in accordance with the leases and demanding written confirmation that the POA would continue to abide by the leases. Plaintiff's Ex. J.

Inasmuch as the POA never provided Fairfield with written confirmation that it would abide by the leases, or documentation that would support a higher rent based on higher operating costs, Fairfield applied to this court and received on July 7, 2006, a Preliminary Injunction, which prohibits the POA from removing Fairfield from the

property subject to the leases.

### D. Plaintiff's Motion for Summary Judgment

Fairfield seeks summary judgment on each of its claims, contending that there are no genuine issues of material fact and that it is entitled to the permanent declaratory relief it seeks as a matter of law. Fairfield also seeks summary judgment on the POA's first counterclaim for breach of contract. For the reasons that follow, the undersigned agrees and will so recommend.

### 1. Summary Judgment on Plaintiff's First Claim for Relief

In its first claim for relief, plaintiff seeks a declaratory judgment regarding the validity of the leases. Id., at ¶¶ 33-38. The POA contends that Fairfield has paid only "common charges" rather than "rent" and that because of such failure to pay rent, the leases are a nullity and that Fairfield must either pay the newly set rent or vacate the premises.

The first question presented is whether the leases are valid and enforceable. This is a question of law, and it appears that the leases are governed by North Carolina law, which provides as follows:

> A valid lease contains four essential elements: (1) identity of landlord and tenant, (2) description of land to be leased, (3) a statement of the term of the lease, and (4) rental or other consideration to be paid. *Fuller v. Southland Corp.*, 57 N.C.App. 1, 8, 290 S.E.2d 754, 759, *disc. rev. denied*, 306 N.C. 556, 294 S.E.2d 223 (1982). A writing, incomplete in itself, is sufficient under the statute "if the contract provisions can be determined from separate but related writings." *Greenberg v. Bailey*, 14 N.C.App. 34, 37, 187 S.E.2d 505, 507 (1972) (citations omitted). "The writings need not be physically connected if they contain internal reference to other writings." *Fuller*, 57 N.C.App. at 7, 290 S.E.2d at 758. While a lease must be recorded to be valid against a lien creditor or a third-party purchaser for value, recordation is not an element of a

valid lease agreement between the original parties to the agreement.
N.C. Gen.Stat. § 47-18.

Purchase Nursery, Inc. v. Edgerton, 153 N.C.App. 156, 160-61 (2002). Of the four elements discussed, the only element placed in issue here is whether the leases contain the element of "rental or other consideration to be paid." Id.

It is undisputed that each lease contained a section entitled "Rental," as set forth above, which required the payment of a monthly rental for each of the two facilities. The language of the leases is clear and there can be no doubt but that each lease contains a rental provision. As a matter of North carolina law, the leases are valid.

Further, the court has looked to the course of conduct between these parties as additional evidence either in favor or against a valid lease. The evidence now before the court is undisputed that Fairfield has timely written and the POA has accepted and deposited over 300 checks in the exact amounts provided under the rental provisions of these leases over the past 13 years. There simply is no evidence now before the court that the monthly payments made by Fairfield for over 13 years were anything other than rent, and the POA has been unable to back up or substantiate its allegation that such payments were for "common charges." At the hearing before the undersigned, respective counsel for the POA could not even explain what "common charges" were. Not only is there no evidence to support the POA's contention that these monthly rents were "common charges," such a contention flies in the face of a lease agreement that could not be any clearer. Southpark Mall Ltd. Part. v. CLT Food Mgmt., Inc., 142 N.C.App. 675, 678

(2001).

Further, there is absolutely no showing that before 2006 the POA ever rejected Fairfield's monthly rental payments or ever brought an action for unpaid rents. As in <u>Szabo Food Service, Inc. of N.C. v. Balentines, Inc.</u>, 285 N.C. 452 (1974), the best evidence of the intent of these parties (if intent cannot be found in unambiguous language of the leases) is the 13 years of "harmonious operation" between the POA and Fairfield. Exhibits C to the leases shows how the rental amount was determined at the commencement of the leases in 1993 by correlating rent to operating expenses. Further, the leases provide a mechanism for increases in Fairfield's next year's rent where the POA can show an increase in operating expenses of more than 10 percent *per anum* in the previous rental year.[2] Plaintiff's Exs. B & C, at ¶ 4. The POA has failed, however, to come forward with any evidence of increased operating expenses for 2005, or for any other year, upon which to base its unilateral increase of Fairfield's rent. The undersigned will, therefore, recommend that the district court grant plaintiff the relief it seeks and declare the leases valid and enforceable.[3]

### 2.    Summary Judgment on Plaintiff's Second Claim for Relief

In the second claim for relief, Fairfield seeks a declaratory judgment regarding

---

[2]    There is no indication from this agreement that anything other than increases in the operating costs for the year immediately previous could be used to increase rent. Thus, if the POA sustained a 9 percent increase in operating costs each year of the lease, it would never be entitled to an increase in rent. This court simply cannot afford relief based on poor bargaining.

[3]    The issue of return of keys to Fairfield is *de minimis* and Fairfield has not made a claim for replevin. Fairfield can certainly call a locksmith or file an action is the small claims court of Rutherford County.

its signage rights under the Settlement Agreement.  Id., at ¶¶ 39-43.  The POA has attacked the validity of the easement given to Fairfield under the Settlement Agreement arguing that it is unenforceable because: (1) the POA did not sign the actual exhibit as attached to the Supplemental Motion presented to bankruptcy court; (2) such agreement violates the statute of frauds; (3) Fairfield failed to create an easement or except an easement from its fee simple deed of the amenities to the POA, making any agreement contained in the settlement agreement a nullity; and (4) Fairfield failed to attach to its warranty deed in 1993 the exhibit to the bankruptcy court's Order that contained the actual easement agreement.

While the POA's points are well taken as to third parties and strangers to the agreement, what the POA fails to acknowledge is that it cannot now be disputed that in 1993 the POA was served with a copy of the signage agreement, that it failed to then object to its terms within the time allowed, and that it was incorporated into the bankruptcy court's final Order.  Further, and within a week of such Order being entered, the POA demonstrated its acceptance of such Order by signing and filing a dismissal of its claims against Fairfield as directed by that Order.  As will be discussed below, the easement was not created by Fairfield's warranty deed of the amenities (although it certainly could have been); rather, an easement by grant was created when the bankruptcy court entered its February 10, 1993, Order.

The agreement specifically created the contractual obligation or easement, as follows:

The properties listed on Exhibits "A" and "B" are to
be conveyed by Fairfield Communities, Inc. to the POA

-14-

subject to the following terms and conditions:

* * *

(e)    **An easement** allowing Fairfield . . . .

Plaintiff's Ex. L, at 6 (emphasis added).

North Carolina has long held that "[a]n "easement" is an incorporeal hereditament, and is an interest in the servient estate." <u>Davis v. Robinson</u>, 127 S.E. 697, 702 (N.C. 1925)(citations omitted). In North Carolina, an easement can be created in at least nine different ways. <u>Waters v. North Carolina Phosphate Corp.</u>, 310 N.C. 438 (1984). In <u>Davis</u>, the North Carolina Supreme Court held, as follows:

> The nine ways in which easements may be created are set out in *Mordecai's Law Lectures*, 464, as follows: "Grant, estoppel, way of necessity, implication, dedication, prescription, ancient window doctrine, reservation, and condemnation."
> As said by this learned author, and our court in *Lindsey v. Bank*, 115 N. C. 553, 20 S. E. 621, the easement of light and air, sometimes called the "ancient window doctrine," does not apply in this state.
> The statute of frauds, as enacted in C. S. § 988, requires "all contracts to sell or convey any lands, tenements or hereditaments, or any interest in or concerning them, * * * [to] be put in writing and signed by the party to be charged therewith, or by some other person by him thereto lawfully authorized.

<u>Davis v. Robinson</u>, <u>supra</u>. Of the nine ways to create an easement, it appears that easement by grant is most analogous to what has occurred in this case:

> The easement in the present case was created by grant. As the result of a condemnation action brought by Carolina Power and Light Company seeking a right-of-way over the subject property, a judgment was entered 24 July 1967 granting to Carolina Power and Light Company an easement across the property. This judgment is recorded in the office of the Clerk of Superior Court of Pamlico County and in Book 147, at page 341, of the office of the Register of Deeds. An easement by grant may be created by judgment. *Yount v. Lowe*, 288 N.C. 90, 215 S.E.2d 563 (1975); *Miller v. Teer*, 220 N.C. 605, 18 S.E.2d 173 (1942).

<u>Waters v. North Carolina Phosphate Corp.</u>, <u>supra</u>, at 442.

As provided in the Settlement Agreement, any conveyance by Fairfield of the amenities was subject to the "terms and conditions" of that agreement, one of which was an easement. When the bankruptcy court entered its Order Approving Settlement of Claims on February 10, 1993, it specifically referenced the "Supplement to Motion to Approve Settlement of Claims," thus granting to Fairfield the signage easement therein contained.

It is undisputed that Fairfield attempted to record this easement when it conveyed the amenities property to the POA by warranty deed through attaching the bankruptcy court's judgment. It is equally undisputed that it failed to do so inasmuch as the page of the Settlement Agreement containing the terms of the easement was, inexplicably, not filed. Also undisputed is the fact that the POA has, since being granted the amenities, conducted itself in a manner which recognized that the now disputed signs were owned by Fairfield or that Fairfield had an easement as to the disputed signs.

For the limited purpose of this action, the undersigned has assumed that the lack of proper recordation of the Arkansas bankruptcy court's judgment in Rutherford County would make the easement by grant unenforceable against bonafide purchasers for value. See N.C.Gen.Stat. 47-27. In North Carolina, "[t]he recording statutes are designed to protect prospective purchasers and encumbrancers of land." Arnette v. Morgan, 88 N.C. App. 458, 463 (1988). As with deeds conveying a fee simple interest, recordation is not a prerequisite to enforcement of agreements as between the parties.

As between the parties to the instrument, the recording of a deed is not necessary to its validity.

The recording of a deed is not essential to an effective conveyance of title. An unrecorded deed is valid between the parties. Recordation is not necessary or essential in general as against all persons except creditors, mortgagees, and bona fide purchasers for value. In considering the effect of unrecorded deeds as against persons other than the parties to the instrument, recording is not essential as against subsequent donees of the grantor, as against volunteers, as against the grantor's assignees under a commission of bankruptcy, as against the grantor's heirs, or as against purchasers, creditors, or persons generally with notice. Although a deed does not contain the recitals required by statute to entitle it to record, it may operate to convey title as between the parties.

CJS DEEDS § 157 (footnotes omitted). North Carolina law is consistent with the universal rule reflected in CJS: "If consideration has been paid for the deed, it is not a deed of gift and its recordation is necessary only as against purchasers for value and lien creditors." Higdon v. Davis, 71 N.C.App. 640, 655 (1984), *review allowed*, 313 N.C. 507 (1985) *and decision aff'd in part, rev'd in part on other grounds*, 315 N.C. 208 (1985).

Finally, the POA has interposed a number of objections based on the lack of its signature on the actual exhibit containing the easement and raised the statute of frauds. The Statute of Frauds provides, as follows:

**§ 22-2. Contract for sale of land; leases**
All contracts to sell or convey any lands, tenements or hereditaments, or any interest in or concerning them, and all leases and contracts for leasing land for the purpose of digging for gold or other minerals, or for mining generally, of whatever duration; and all other leases and contracts for leasing lands exceeding in duration three years from the making thereof, shall be void unless said contract, or some memorandum or note thereof, be put in writing and signed by the party to be charged therewith, or by some other person by him thereto lawfully authorized.

N.C.Gen.Stat.§ 22-2. An easement is subject to the statute of frauds. Prentice v.

Roberts, 32 N.C.App. 379, *review denied* 292 N.C. 730 (1977). North Carolina law is equally clear that to satisfy the statute of frauds, all provisions of the agreement need not be in the same writing:

> Defendants contend the agreement in the instant case is null and void because no final writing was ever executed by the parties. However, noting that the statute of frauds "does not require all of the provisions of the contract to be set out in a single instrument[,]" our Supreme Court has stated that "[t]he memorandum ... is sufficient if the contract provisions can be determined from separate but related writings." *Hines v. Tripp*, 263 N.C. 470, 474, 139 S.E.2d 545, 548 (1965); N.C. Gen.Stat. § 22-2 (2003).

The Currituck Associates v. Hollowell,  166 N.C.App. 17, 28 (2004). The POA's argument as to the statutes of frauds fails inasmuch as its counsel signed the dismissal required by the Order that incorporated and referenced the terms of the easement. Further, the easement was created by and through the judgment of the bankruptcy court, and an easement by grant simply does not require the assent or signature of any party.

The POA's arguments are further foreclosed by application of the doctrine of judicial estoppel. In King v. Herbert J. Thomas Mem. Hosp., 159 F.3d 192 (4th Cir. 1998), the appellate court held that

> Judicial estoppel, an equitable doctrine that prevents a party who has successfully taken a position in one proceeding from taking the opposite position in a subsequent proceeding, is recognized to protect the integrity of the judicial system. Acting on the assumption that there is only one truth about a given set of circumstances, the courts apply judicial estoppel to prevent a party from benefitting itself by maintaining mutually inconsistent positions regarding a particular situation. As we have previously observed, the doctrine is invoked to prevent a party from "playing fast and loose with the courts," from "blowing hot and cold as the occasion demands," or from attempting "to mislead the [courts] to gain unfair advantage." As an equitable doctrine, judicial

> estoppel is invoked in the discretion of the district court and with the recognition that each application must be decided upon its own specific facts and circumstances.

Id., at 196 (citations omitted). Because the law assumes "that there is only one truth about a given set of circumstances," id., the Court of Appeals for the Fourth Circuit has adopted the doctrines of judicial estoppel and *quasi* estoppel to prevent litigants from benefitting from inconsistent factual positions, which not only make a mockery out of the courts, but would put in jeopardy the full faith and credit afforded to earlier decisions.

In a recent decision, the Court of Appeals for the Fourth Circuit in <u>National Union Fire Ins. Co. of Pittsburgh, Inc. v. Manufacturers and Traders Trust Co.</u>, 2005 WL 670617 (4th Cir. March 23, 2005), recited the elements of judicial estoppel:

> The doctrine of judicial estoppel has three necessary elements: (1) The party to be estopped must be asserting a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding; (2) the prior inconsistent position must have been accepted by the tribunal; and (3) the party to be estopped must have taken inconsistent positions intentionally for the purpose of gaining unfair advantage. But "judicial estoppel will not be applied where the party's inconsistent positions resulted from inadvertence or mistake."

Id., 2005 WL, at 2 (citing <u>King</u>, <u>supra</u>). The undersigned will, therefore, review the elements to determine whether they apply in this case.

First, the POA's position in this separate legal proceeding is clearly different than what it represented to the bankruptcy court in 1993, and application of the doctrine would further serve its purpose:

> the doctrine seeks to preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions. Preserving the

-19-

> sanctity of the oath prevents the perpetuation of untruths which damage public confidence in the integrity of the judicial system.  Second, the doctrine seeks to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings.

Bates v. Long Island R.R. Co., 997 F. Supp. 1028, 1038 (2d Cir. 1993).

Second, it appears from the bankruptcy court's Order that it fully accepted the proposed settlement that contained the easement reserved by Fairfield.  Further, the bankruptcy court made reference to the document in which the easement was contained by name, and required as part of such approval that POA file a dismissal of its claims, which it did.

Third, and finally, this court must determine whether the party to be estopped has taken inconsistent positions intentionally for the purpose of gaining an unfair advantage.  This is the most troubling determination the court must make, not because it is difficult, but because of what such a determination, if made, implies. Having read every page of the materials submitted to the court, it is beyond question that the POA's attacks on the leases as well as the easement were not motivated by a genuine belief that such were void.  The court need look no further than the conduct of the parties over the 13 years immediately preceding the dispute to find compelling and admissible evidence that the POA both believed Fairfield was paying its rent and that it had an easement as to certain signs on POA's property.  Instead, it would appear that in January 2006, the POA set a new course of business for Rumbling Bald Resort and determined that Fairfield was simply excess baggage.  No where better is this attempt to gain an unfair advantage evident than in the POA's clearly concocted

theory that Fairfield's 300 previous rental payments - - in the exact amounts specified in the lease agreements under "Rental" - - were somehow now not rent, but "common charges." Review of the letters of record from POA's officers indicate that they well knew the signs were the property of Fairfield and under their control pursuant to an easement. Indeed, it appears that even the POA's employees or contractors knew these signs belonged to Fairfield when they honored Fairfield's request not to mow around these signs. Further, when the POA desired over the years to append their own signs to Fairfield's signs, they did not just put their own signs on top; instead, they first sought Fairfield's permission, which was apparently liberally granted.

In 2006, however, things changed dramatically and the POA clearly wanted shed of its creator now turned competitor. Following soon on the heels of the POA's revelation as to rent and the demand letters it received from Fairfield in return, as well as this court's preliminary injunction, came the attack on the signs. Under <u>King</u>, the undersigned can come to no other reasonable conclusion other than that the POA has taken inconsistent positions intentionally for the purpose of gaining unfair advantage. A litigant cannot make one representation to a federal court in 1993 to secure a favorable outcome and then, in 2006, when the deal is no longer as sweet, deny such representation to another federal judge simply to further its aim of ridding itself of an unwanted bedfellow.

Finding that Fairfield is entitled to the judgment it seeks and that the POA is judicial estopped from asserting a position before this court that is contrary to that asserted before the United States Bankruptcy Court for the Eastern District of

Arkansas, the undersigned will recommend that Fairfield's Motion for Summary Judgment be granted and declare the easement by grant afforded by the bankruptcy court valid and enforceable as between these parties.

### 3. Summary Judgment on Plaintiff's Third Claim for Relief

In the third claim, plaintiff seeks to make the preliminary injunction permanent as to its rights under the leases and the settlement agreement. Inasmuch as the undersigned will recommend summary judgment be granted in favor of plaintiff on the first two claims, it follows that the district court should, if such recommendations are accepted, make the preliminary injunctions permanent as to its rights under the leases and the settlement agreement. The undersigned will so recommend.

### 4. Summary Judgment on Defendant's Counterclaim for Breach of Contract

Fairfield seeks summary judgment in its favor on defendant's first counterclaim for breach of contract. In North Carolina, "[t]o show a breach of contract, [the claimant] must show the existence of a valid contract and a breach of the terms of that contract." Purchase Nursery, Inc. v. Edgerton, supra, at 160. In this counterclaim, defendant contends that plaintiff owes it 13 years of back rent under its wholly unsupported theory that the rental payments it received from plaintiff over the past 13 years were inadequate and were supposedly attributable to the amorphous "common charges" rather than rent. The undersigned reincorporates herein the discussion supra finding the leases both valid and enforceable.

In substance, the POA claims that Fairfield breached the leases by not "reasonably us[ing] their best efforts to fairly allocate" the yearly operating costs. Answer to Amended Complaint, at ¶156. Review of the lease agreements and the exhibits thereto does not reveal that the parties either agreed or contemplated that it would be the lessee's exclusive duty to review the lessor's books and determine what the lessor's increased operating costs were for a given year in an effort to raise its own rent. A fair reading of the Complaint imposed a mutual obligation that was triggered by the lessor informing the lessee that its operating costs had risen more than 10 percent in the preceding rental year.

Common sense needs to come into play at some point in this dispute, and common sense along with a fair reading of the leases would dictate that if the lessor wanted to raise the rent based on increased operating costs of the previous year, it would be the lessor's duty - - as well as best interests - - to seasonably do so and show to Fairfield that it sustained an increase in operating costs of more than 10 percent in a given year. At that point, and upon a proper showing, Fairfield would have a duty under the terms of the lease to pay a higher rent. Under a fair reading of the leases, the acceptance of rental payments for each year without first seeking an adjustment for that year bars the retrospective recovery sought in this counterclaim.

Thus, the duty to adjust rent was a duty imposed on both parties, which was contingent upon the POA making a seasonable demand and showing. It is undisputed that the POA neither provided Fairfield with any documentation evidencing increases in operating costs, nor did it ever notify Fairfield that it desired to increase Fairfield's

monthly payments under the leases. Cain Depo., at pp. 50-51. Even assuming that the leases required Fairfield to use best efforts in adjusting rents, it simply had no information from the POA that it sustained an increase in operating costs of more than 10 percent in any given year. Further, there is no evidence in this record that would support any such finding as to an increase in costs for any year.

Fairfield having paid the rents due, cannot as a matter of law be in breach of these leases, and the undersigned will respectfully recommend that the POA's first counterclaim for breach of contract be dismissed with prejudice.

### E.    The POA's Motion for Partial Summary Judgment

If the recommendations of the undersigned are accepted by the district court, the POA's cross motion for partial summary judgment on plaintiff's claims are moot. In addition, the POA seeks partial summary judgment as to its Fifth Counterclaim, which is captioned as a claim for "Easement Unenforceable." The validity and enforceability of the easement is discussed at length above, and the recommendation of the undersigned makes further discussion in the context of the POA's Motion for Partial Summary Judgment moot.

Further, the undersigned has reviewed all of the POA's counterclaims to determine whether there is anything left for trial and, most respectfully, finds that there is no cause of action for "Easement Unenforceable" in North Carolina common law. Instead, an assertion that an easement is unenforceable appears to be an affirmative defense. Likewise, defendant's second counterclaim for "Unconscionable Contract," third counterclaim for "Lack of Consideration," and fourth counterclaim

for "Breach of Condition Subsequent," all suffer from the same failure to state a claim as a matter of law. Fed.R.Civ.P. 12(b)(6). The undersigned will therefore recommend that defendant's counterclaims two through five be dismissed in accordance with Rule 12(b)(6) for failure to state a claim upon which relief can be granted, but that they be construed as "additional affirmative defenses one through four."

### F.  Consent Motion to Admit Affidavit of Dennis Buckner

On May 15, 2007, the defendant filed a Consent Motion to Admit Affidavit of Dennis Buckner. The previous affidavit was unreadable due to a scanning error. The motion will be allowed and the court has fully considered Mr. Buckner's averments. As noted above, defendant's claim that plaintiff missed a rental payment in February 2007 is beyond the bounds of any claim in the Amended Complaint or any Counterclaim in the Answer, nor does it appear that resolution of this claim is necessary to resolution of the issues before the court. This court simply is not the arbiter of all disputes past, present, and future between these parties, and it is unlikely that diversity jurisdiction could be invoked as to such a claim in any event. The typical way issues of non-payment of rent are resolved are by one party presenting to the other a copy of the cancelled check showing thereupon the endorsement of the lessor. Certainly a cause of action for non-payment of one month's rent is actionable, but the undersigned would not recommend that either party be allowed to amend their claims at this last date to assert such a *de minimis* claim. The POA would have an adequate remedy to collect unpaid rent in the small claims court of Rutherford

County.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that

(1)   plaintiff's Motion for Summary Judgment (#68) be **GRANTED** in its entirety, and that **JUDGMENT** be entered in favor of plaintiff and against defendant finding as follows:

    (a)   the leases are valid and enforceable and that the preliminary injunction entered in this case be made permanent;

    (b)   the Signage Agreement is valid and enforceable and that the preliminary injunction entered in this case be made permanent; and

    (c)   as to the POA's first counterclaim, summary judgment be **GRANTED** to plaintiff dismissing with prejudice the POA's first counterclaim; and

(2)   defendant's Motion for Partial Summary Judgment (#73) be **DENIED** as moot, and further that

    (1)   Counterclaims Two through Five be **DISMISSED WITH PREJUDICE** in accordance with Rule 12(b)(6), Federal Rules of Civil Procedure, inasmuch as they do not state causes of action recognized at common law in North Carolina; and

  (2) that Counterclaims Two through Five be deemed to be "additional affirmative defenses one through four;" and

 (3) defendant's Consent Motion to Admit Affidavit of Dennis Buckner be **ALLOWED.**


  The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same.  Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).



  Signed: May 17, 2007


  Dennis L. Howell
  United States Magistrate Judge